**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **[UNDER SEAL]** | § | **Civil Action No.** _____ |
| | § | |
| **Plaintiffs,** | § | **COMPLAINT FOR DAMAGES** |
| | § | **UNDER THE FEDERAL FALSE** |
| **v.** | § | **CLAIMS ACT AND TEXAS** |
| | § | **MEDICAID FRAUD PREVENTION** |
| **[UNDER SEAL]** | § | **ACT** |
| | § | |
| **Defendants.** | § | |
| | § | **FILED IN CAMERA AND UNDER** |
| | § | **SEAL PURSUANT TO 31 U.S.C.** |
| | § | **§ 3730(b)** |
| | § | |
| | § | |
| | § | |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* **DOE, Relator,** § | |
| **THE STATE OF TEXAS,** *ex rel.* **DOE, Relator,** § | **Civil Action No.** _____ |
| **Plaintiffs,** § | **COMPLAINT FOR DAMAGES UNDER THE FEDERAL FALSE CLAIMS ACT AND TEXAS MEDICAID FRAUD PREVENTION ACT** |
| **v.** § | |
| **TEXAS CHILDREN'S HOSPITAL; TEXAS CHILDREN'S HEALTH PLAN, INC.; DR. DAVID L. PAUL; AND DR. RICHARD OGDEN ROBERTS III** § | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)** |
| **Defendants.** § | |

Relator Doe ("Relator") brings this action on behalf of the United States of America and the State of Texas against Defendants Texas Children's Hospital (TCH), Texas Children's Health Plan, Inc. (TCHP), Dr. David L. Paul, and Dr. Richard Ogden Roberts III for submitting false claims to Medicaid and other federal- and state-funded insurance. Texas's Medicaid program, which is jointly funded by the federal government and Texas, excludes from coverage services designed to transition a patient's sex. For years, Defendants nevertheless prescribed medications and procedures to accomplish such transitions and billed them to Texas's Medicaid program. Defendants accomplished this through various means, including providing false diagnoses and creating records of such false diagnoses to obtain payment for services that were ineligible for reimbursement under Texas's Medicaid policies and procedures.

2

**INTRODUCTION**

1.      This is a civil fraud action brought on behalf of the United States and the State of Texas to recover statutory damages and civil penalties pursuant to the False Claims Act, 31 U.S.C. §§ 3729 *et seq*. (FCA), and to recover statutory damages and civil penalties pursuant to the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§ 36.001 *et seq.* (TMFPA).

2.      From 2020 at the latest to 2023 at the earliest, Defendants knowingly presented or caused to be presented to federal- and state-funded insurance programs false or fraudulent claims for payment and knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims.

**PARTIES**

3.      Relator Doe is a citizen of the United States and a resident of the State of Texas. Relator is a member of the TCH medical personnel.  In that role, Relator has access to the medical records that form the basis for this complaint in the ordinary course of Relator's work.

4.      Relator has already experienced harassment, threats, and intimidation related to Relator's observations regarding the transgender care involved in this case.  Defendants have also threatened or assisted others to threaten those who have disclosed information about the transgender care that Defendants provide or who may know who has disclosed such information. Relator thus reasonably fears further harassment, threats, intimidation, and retaliation if Relator's identity is disclosed in connection with this lawsuit.  Relator intends to file a motion for a protective order to permit Relator to proceed in this case under a pseudonym.

5.      Defendant Texas Children's Hospital is a non-profit teaching hospital and the largest children's hospital in the United States.  It resides in Texas, including the Southern District of Texas.  Its main campus, a Level I pediatric trauma center, is located in the Texas Medical Center in Houston, Texas.  TCH is the primary pediatric teaching hospital affiliated with Baylor

College of Medicine. It has satellite campuses and clinics throughout the Houston metropolitan area.

6. Defendant Texas Children's Health Plan, Inc. is a nonprofit health maintenance organization that was founded by TCH. It offers managed care plans for Medicaid (including STAR and STAR Kids) and the Children's Health Insurance Program.

7. Defendant David L. Paul is a pediatric endocrinologist on the faculty of TCH since 2012, and he has treated several hundred children and adolescents with gender dysphoria during that tenure. He has regularly prescribed puberty blockers and cross-sex hormones.

8. Defendant Richard Ogden Roberts III is a pediatric endocrinologist on the faculty of TCH since 2020, and he has treated at least several hundred children and adolescents with gender dysphoria during that tenure. He has regularly prescribed puberty blockers and cross-sex hormones. Since 2020, he has served as the Baylor College of Medicine and TCH Division of Endocrinology Transgender Care Co-Lead. As of 2023, he also serves as co-Medical Director of the Transgender Care Program at TCH.

### JURISDICTION & VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732(a) because this civil action arises under the laws of the United States and because federal law permits Relator to bring these claims on behalf of the United States as the real party in interest.

10. This Court has supplemental jurisdiction to entertain the Texas claims based on violations of the TMFPA pursuant to 28 U.S.C. § 1367(a) and 31 U.S.C. § 3732(b).

11. Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732 because at least one defendant resides in the district and all Defendants reside in

Texas and also because a substantial part of the events giving rise to the claims occurred in the district, including the FCA violations.

12.     There has been no prior public disclosure of substantially the same allegations as in this complaint in a criminal, civil, or administrative hearing, or from the news media.  Even if there has been such a public disclosure, Relator is an original source of the information because Relator's knowledge is independent of any publicly disclosed allegations and adds material details about the fraud to any that are publicly available, and Relator has voluntarily provided the information to the federal and Texas governments before filing this action.

**FACTS**

**I.     Statutes**

   **A.     The Medicaid Program and State Administration**

13.     Pursuant to Title XIX of the Social Security Act of 1965, 42 U.S.C. §§ 1396 *et seq.*, the Medicaid Program ("Medicaid") as a joint federal-state program to provide health care benefits to indigent and disabled individuals to enable them to receive medical care.  Under Medicaid, each state establishes its own eligibility standards, provider qualifications, and program administration in accordance with certain minimum federal requirements.  42 U.S.C. §§ 1396, 1396a.  The state pays the health care providers for services rendered to Medicaid recipients, with the state obtaining the federal share of the Medicaid payments from accounts that draw on the United States Treasury. *See generally* 42 C.F.R. §§ 430.0–.30.

14.     The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage (FMAP), is based on a state's per capita income compared to the national average.  42 U.S.C. § 1396d(b).  The FMAP for all states, including Texas, is at least 50 percent.

15.     Under Title XIX of the Social Security Act, each state must establish an agency to administer its Medicaid program according to federal guidelines.  42 U.S.C. § 1396a.  Texas administers its Medicaid program through the Texas Health and Human Services Commission (HHSC).

16.     The majority of health care provided through Medicaid, including in Texas, is administered through Medicaid managed care organizations (MCOs).  MCOs are contracted by the state—in Texas, HHSC—to provide services to Medicaid managed care clients.  The client chooses a Medicaid managed care health plan and primary care provider.  Generally, fixed capitation rates are paid to an MCO per member per month with the expectation that the MCO will manage payments for services to providers on behalf of their enrolled clients through contractual arrangements with providers.  HHSC establishes managed care capitation rates and biennially reevaluates them using a mathematical analysis that considers past experience (services provided), risk, and fee-for-service rate modifications.

17.     Although MCOs are not paid on a fee-for-service model, they too must submit encounter data for each service delivered to a Medicaid beneficiary enrolled in the MCOs' managed-care plans and the payments the MCOs make to providers for those services to the state— for Texas, HHSC—and to the U.S. Department of Health and Human Services (HHS).  This process is required both under the Texas Medicaid program and federal regulations.  42 CFR §§ 438.5, 438.6, 438.604, 438.818.

18.     Federal regulations require that MCOs submit accurate and complete encounter data to the state and that the state submit accurate and complete encounter data as a condition of receiving federal funds, *i.e.*, Federal Financial Participation.  42 CFR § 438.818.  Data that is not accurate and complete can result in loss of federal funds.  *Id.*

19.    Federal regulations require that, concurrently with the encounter data that MCOs submit, a certification must be made by a high-level corporate official of the MCO that, based on the best information, knowledge, and belief, the data, the documentation, and information in the encounter data is accurate, complete, and truthful.  42 C.F.R. § 438.606.

20.    States, including Texas, use the encounter data submitted to them to set the capitation rates.  Texas specifically uses encounter data, along with changes to its Medicaid fee-for-service rates and other adjustments, to biennially revise the capitation rate.  Federal regulations also generally require that encounter data be used to set capitation rates.  42 CFR §§ 438.5, 438.6. Accordingly, additional encounters in one period lead to higher capitation rates in future periods, meaning that they result in higher payments by Texas and the federal government to the MCO through higher capitation rates.

21.    Additionally, by federal regulation a state must require the MCO to submit the data on the basis of which the state certifies the actuarial soundness of capitation rates, and the MCO must also concurrently make the same certification as for the encounter data.  42 C.F.R. §§ 438.604, .606.

22.    By federal regulation, a state must also require by contract an MCO to have a program for identifying and self-reporting any overpayments (payments that do not qualify for Medicaid coverage) to health care providers and any fraud.  42 CFR § 438.608.

23.    Consistent with federal law, and to ensure the safety of its Medicaid recipients, Texas law imposes rigorous standards and requirements on Medicaid providers.  Texas requires Medicaid providers to comply with federal and state laws and regulations and to ensure that its employees and agents provide services in compliance with accepted medical and ethical standards as a condition of receiving Medicaid reimbursements.

7

24.     Texas has several types of Medicaid programs.  Most people who receive health care through Medicaid (Medicaid clients) in Texas participate in the STAR program, which covers primary care services for low-income women and children.  STAR Kids is a Texas Medicaid managed care program that provides Medicaid benefits to children and adults 20 and younger who have disabilities.

25.     These Texas Medicaid programs pay a capitation rate of several hundred to over a thousand dollars per patient per month and far more in certain circumstances.

26.     Texas also imposes additional requirements on MCOs.  One such requirement is that MCOs share significant profits with the state.  The experience rebate is a tiered gain-sharing system where positive net income thresholds are shared with Texas.  Following the COVID-19 pandemic, many MCOs in Texas generated significant net incomes and shared the profits with Texas.  Defendant TCHP, for both its STAR and STAR Kids Programs, shared profits with the State in at least fiscal year 2022.

27.     As required by Texas HHSC, medical providers who desire to be eligible for Medicaid payments must complete a Texas Medicaid Provider Enrollment Application and enter into a written provider agreement with HHSC.  Federal Medicaid regulations likewise require such an agreement and mandate that all Texas providers must revalidate their enrollment in the Texas Medicaid Program every three or five years based on provider type.  Thus, TCH and TCHP were required, as a condition of enrollment and participation in the Texas Medicaid Program, to enter into a written HHSC Medicaid Provider Agreement ("Texas Provider Agreement") and to periodically revalidate its enrollment.

28.     By signing the Texas Provider Agreement, a provider certifies its understanding of and willingness to comply with the agreement's terms, as well as its understanding that

concealment of a material fact or pertinent omissions may constitute fraud and may be prosecuted under applicable federal and state law. The provider agrees to submit encounter data and certifies that information submitted regarding claims or encounter data will be true, accurate, and complete, and that the provider's records and documents are both accessible and validate the services and the need for services. The provider further certifies its understanding and agreement that any falsification, omission, or misrepresentation in connection with the application for enrollment or with claims filed may result in all paid services declared as an overpayment. And the provider certifies and agrees that it has an affirmative duty to refund any overpayments, duplicate payments, and erroneous payments that are paid to the provider by Medicaid as soon as such payment is discovered or reasonably should have been known.

29.    The Texas Provider Agreement incorporates by reference the Texas Medicaid Provider Procedures Manual ("Texas Provider Manual") and mandates that providers comply with all requirements of the Provider Manual, as well as all state and federal laws governing or regulating Medicaid. Providers must further acknowledge their duties to be familiar with the Provider Manual and to ensure that employees acting on behalf of the providers also comply with the requirements set forth in the Provider Manual. Providers further agree under the Provider Agreement that they will comply with applicable state and federal laws governing and regulating Medicaid, and all state and federal laws and regulations related to waste, abuse, and fraud.

30.    By signing the Texas Provider Agreement and enrolling in the Texas Medicaid Program, Texas Medical Center certified that it understood and would comply with all the requirements thereof.

31.    Since at least 2015, and continuing through the present, the Texas Provider Manual has at the very beginning included a section on "Texas Medicaid Limitations and Exclusions."

That section provides a long list of "services, supplies, procedures, and expenses" that are excluded from coverage and "are not benefits of Texas Medicaid."  It also states, "This list is not all inclusive."

32.    Since at least 2015, and continuing through the present, the list of exclusions has included "sex change operations."  The list has also included other exclusions that are relevant to gender transition and gender-affirming procedures being excluded from Texas Medicaid, including "procedures and services considered experimental or investigational," "services or supplies that are not reasonable and necessary for diagnosis or treatment," "services or supplies that are not specifically provided by Texas Medicaid," and "sterilizations (including vasectomies) unless the client has given informed consent 30 days before surgery, is mentally competent, and is 21 years of age or older at the time of consent."

33.    The exclusion in the Texas Provider Manual for sex change operations is and has been widely understood to exclude gender-affirming care, including hormone treatments.  For example, an April 25, 2023 article in the *Texas Tribune* stated, "In Texas, Medicaid and the Children's Health Insurance Program already don't cover transition-related surgeries and prescription drugs like hormone therapies and puberty blockers."  And in a 2021 survey by KFF, an independent source for health-policy research, polling, and news, Texas Medicaid authorities indicated to the surveyors that Texas Medicaid does not cover gender-affirming care, including gender-affirming surgery or gender-affirming hormone therapy.

**B.    Federal False Claims Act**

34.    The FCA, 31 U.S.C. §§ 3729 *et seq*., reflects Congress's goal to "enhance the Government's ability to recover losses as a result of fraud against the Government."  S. Rep. No. 99-345, at 1 (1986), *available at* 1986 U.S.C.C.A.N. 5266.  The FCA establishes civil penalties

10

and treble damages liability for an individual or entity that knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; that knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; conspires to do the same; or other fraudulent conduct causing harm to the government.  31 U.S.C. § 3729(a)(l).  An individual or entity also violates this provision of the FCA by making an implied false certification if it submits a claim for payment and knowingly fails to disclose its noncompliance with a statutory, regulatory, or contractual requirement that renders the individual's representations about its services misleading.

35.     An individual or entity that violates the FCA is liable for a civil penalty of at least $5,000 and no more than $10,000, now adjusted significantly higher for inflation, for each claim or overpayment, plus damages of three times the amount of each claim or overpayment.  *Id*. § 3729(a)(l).

**C.     Texas Medicaid Fraud Prevention Act**

36.     The TMFPA establishes a cause of action for false claims in the Texas Medicaid Program. Tex. Hum. Res. Code §§ 36.001 *et seq*.  The TMFPA provides that the Texas Attorney General or a private citizen may prosecute cases under the TMFPA in the name of the State of Texas.  *Id*.§ 36.101.

37.     The TMFPA establishes civil penalties and treble damages liability for an individual or entity that knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under a health care program that is not authorized or that is greater than the benefit or payment that is authorized; knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under a health care program that is not authorized or that is greater than the

benefit or payment that is authorized; knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning information required to be provided by a federal or State law, rule, regulation, or provider agreement pertaining to a health care program; knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under a health care program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to Texas under a health care program; or other fraudulent conduct causing harm to the State. *Id*. § 36.002.

38.    The TMFPA does not require the submission of a claim for liability.

39.    An individual or entity that violates the TMFPA is liable for three times the amount of any payment or the value of any monetary or in-kind benefit provided under a health care program, directly or indirectly, as a result of the unlawful act, including any payment made to a third party. *Id*. § 36.052.

40.    An individual or entity that violates the TMFPA is also liable for a civil penalty in the same range as provided by the federal False Claims Act for each claim or overpayment. *Id.*

## II.    Texas Children's Hospital's Fraud

### A.    Texas Children's Hospital's Transgender Program

41.    TCH has provided "gender-affirming care" to children and adolescents with gender dysphoria—also referred to as "transgender" individuals—for years.  Although it has had a Transgender Care Program since at least 2020, it did not publicly disclose the existence of this program until 2023.

42.    Patients with gender dysphoria believe that their internal sense of their being male or female (their "gender identity") does not match their sex.  Under the gender-affirming care

model, psychiatric and medical interventions are intended to help align the patient's physical traits with the patient's gender identity rather than to psychiatrically treat the incongruence.

43. The gender-affirming care model began with Dutch researchers who sought to medically "transition" the sex of gender dysphoric adolescents before those adolescents reached adulthood. The motivating idea was that if medical intervention began at the beginning of puberty through puberty blockers and then cross-sex hormones, the patient could have a physical appearance more congruent with the patient's gender identity than if the patient went through puberty (and had a sex change operation afterward), and surgery to further align physical appearance with gender identity would be more successful. Studies have since demonstrated that this approach is misguided.

44. In 2021, the Chair of the Texas House of Representatives Committee on General Investigating requested an opinion from the Texas Attorney General on whether various interventions for minors with gender dysphoria could be considered child abuse under Texas law. On February 18, 2022, the Texas Attorney General responded that chemical and surgical interventions done for purposes of gender reassignment, including those that cause temporary or permanent infertility, could violate Texas criminal laws.

45. Shortly after that opinion was released, on March 4, 2022, TCH issued a public statement that it had "paused hormone-related prescription therapies for gender-affirming services" in order to "safeguard" its healthcare providers from "legal ramifications."

46. Despite TCH's statement, it and the Defendant physicians continued such procedures without any pause at all. Similar procedures continued through 2022 and into 2023, including the provision of puberty blockers and hormones to preexisting and new minor patients.

47. In May 2023, the Texas Legislature passed, and Governor Abbott signed, SB 14, a law that prohibits physicians and health care providers from providing gender-transitioning or gender-reassignment procedures and treatments to minors in Texas. It also expands the prohibition on Medicaid funds for gender transition treatments to all public funds being directly or indirectly used, granted, paid, or distributed to any health care provider, medical school, hospital, physician, or any other entity, organization, or individual that provides or facilitates the provision of a procedure or treatment to a child that is prohibited under SB 14.

48. Following the passage of SB 14, the Defendant physicians, along with a psychiatrist colleague at TCH, advocacy groups, and others, filed suit in Travis County district court to enjoin the law. As part of the complaint, Dr. Roberts provided an affidavit stating (in the context of discussing minor transgender patients of his): "a significant number of my patients are on Medicaid or the Children's Health Insurance Program, which SB 14 prohibits from covering gender-affirming medical care." He further stated that "SB 14 directly blocks Medicaid and CHIP from covering gender-affirming medical treatment" and that he has "patients who receive their health coverage through Medicaid or CHIP and this provision would bar them from obtaining the care that they need on top of the general prohibition set forth in SB 14."

49. Dr. Paul similarly provided an affidavit stating (again in the context of treating patients with gender dysphoria): "A significant number of my patients receive coverage for their medical care through Medicaid or CHIP."

50. While these statements imply that the Defendants had already used Medicaid funds to provide endocrine treatments to transgender minors, the Defendant physicians carefully avoided explicit admissions to that precise effect.

B.    The Fraud

51.    The Defendant physicians saw a large number of patients with gender dysphoria in TCH's Endocrine Clinic at its main campus and elsewhere from at least 2020 to present.  Many of these patients have Medicaid.  TCH and the Defendants physicians treated Medicaid patients under the gender-affirming care model, including prescribing puberty blockers, cross-sex hormones, and other hormone treatments to align the patients' appearance with their internal sense of sex.  These procedures were intended to effect a change in sex.

52.    While the treatment of the following five patients provides examples of the fraud Defendants committed and represents well over a hundred thousand dollars in damages, on information and belief, Defendants did similarly for many others patients.  TCH and TCHP have each received many billions of dollars through Medicaid during the 2020–2023 time period.

**Patient 1**

53.    Patient 1 has TCHP Star health insurance.  Patient 1 is a male who identifies as female, and the medical records reflect a designation of "female."

54.    Beginning in 2022 at the latest, when Patient 1 was 16 years old, Dr. Paul treated Patient 1.  At an appointment that year, Dr. Paul diagnosed or confirmed diagnoses of male-to-female transgenderism, hypogonadism, estrogen deficiency, and hyperandrogenism.  Dr. Paul did not indicate that any tests confirmed any of these diagnoses.  At that appointment, Patient 1 had already been prescribed and was taking spironolactone to block testosterone and estradiol cypionate injections.  Dr. Paul noted that Patient 1 had noticed increased breast tissue but wanted more and wanted to reduce facial hair.  Dr. Paul indicated that he would stop the spironolactone, change the testosterone blocker to bicalutamide, and check estradiol levels to see if they could be increased to further feminization.  He noted that bicalutamide would block androgen receptors

15

better and would help reduce facial and body hair.  Dr. Paul ordered many tests, including a testosterone test for women and children.

55.    Later in 2022, Dr. Paul had another visit with Patient 1 at the Endocrine Clinic.  At that visit, Dr. Paul noted that Patient 1 had been unable to get refills, increasing the need to shave, and although there was full breast development, Patient 1 wanted them to appear more feminine. Dr. Paul provided diagnoses of male-to-female transgender person and hyperandrogenism.  Dr. Paul changed the prescription to an estradiol patch with added progestin in the form of norethindrone to make the breasts more feminine.  He also continued bicalutamide as a testosterone blocker.

56.    In 2023, Patient 1 had another visit with Dr. Paul at the Endocrine Clinic.  Patient 1 wanted to return to estradiol injections, so Dr. Paul prescribed estradiol valerate injections.  The only visit diagnosis was male-to-female transgender person.  Dr. Paul indicated that he would discuss progesterone therapy options for breast development with gynecology.  Patient 1 wanted breast augmentation surgery and to have Patient 1's gender marker and name changed legally.

57.    The medical records for Patient 1 do not support diagnoses of hypogonadism, estrogen deficiency, and hyperandrogenism, and these diagnoses are inconsistent and irreconcilable.  These diagnoses were false and intended by Dr. Paul to cover up or justify gender-affirming hormone therapy.  Treatment for these false diseases was not medically necessary but caused significant medical risks.

58.    The only basis for classifying Patient 1 as a female in medical records, for having appointments with the endocrine clinic, and for prescribing the medicines described above was to

16

change Patient 1's sex in violation of Texas Medicaid policy. Dr. Paul made clear that the purpose of all of this was to conform Patient 1's appearance to that of the opposite sex.

59. On information and belief, Dr. Paul and TCH submitted all of this medical care for reimbursement to TCHP, which in turn included it all in encounter data provided to Texas and the federal government.

**Patient 2**

60. Patient 2 has Superior HealthPlan Texas Star insurance. Patient 2 is a female who identifies as male, and the medical records reflect a designation of "male."

61. Beginning in 2022 at the latest, when Patient 2 was 17 years old, Dr. Paul treated Patient 2. Patient 2 had already been on testosterone injections, but to increase testosterone levels, in 2022, Dr. Paul prescribed Androgel, a testosterone gel. In order to prescribe the gel, he told Patient 2 he had to change the diagnosis from testosterone deficiency to transgender male because the Superior HealthPlan insurance would not accept the first diagnosis. Dr. Paul indicated that he had not seen this before, suggesting that he had used false diagnoses in previous cases.

62. Dr. Paul continued to prescribe Patient 2 testosterone into 2023 in the form of testosterone cypionate for injection with associated diagnoses of testosterone deficiency and hypogonadism. In an office visit at the Endocrine Clinic shortly thereafter, Dr. Paul noted that Patient 2 was happy with the physical changes that testosterone produced, including a deeper voice and discontinued menstruation. Dr. Paul again prescribed testosterone cypionate with associated diagnoses of female-to-male transgender person, testosterone deficiency, and hypogonadism.

63. The medical records do not support diagnoses of hypogonadism or testosterone deficiency. These diagnoses are false and intended by Dr. Paul to justify or cover up gender-affirming hormone therapy. Treatment for these false diseases was not medically necessary.

17

64. The only basis for classifying Patient 2 as a female in medical records, for having appointments with the endocrine clinic, and for prescribing the medicines described above was to change Patient 2's sex in violation of Texas Medicaid policy. Dr. Paul made clear that the purpose of all of this was to conform Patient 2's appearance to that of the opposite sex.

65. On information and belief, Dr. Paul and TCH submitted all of this medical care for reimbursement to Superior HealthPlan Texas Star insurance, which in turn included it all in encounter data provided to Texas and the federal government.

**Patient 3**

66. Patient 3 has TCHP Star Kids health insurance. Patient 3 was seen by TCH doctors for gender dysphoria from at least 2021 to 2023. Patient 3 is a male who identifies as female, and the medical records reflect a designation of "female."

67. In March 2021, Patient 3, who was 17 years old at the time, had an initial visit with the endocrinology clinic to discuss gender dysphoria. Patient 3 expressed interest in hormone therapy to stop the more pronounced aspects of male puberty, including a deepening voice and body hair. At this visit, or shortly thereafter, Patient 3 was prescribed bicalutamide to block testosterone and an estradiol patch.

68. Patient 3 had a follow-up telemedicine appointment later that year with Dr. Roberts at the TCH Endocrine Clinic. Dr. Roberts characterized bicalutamide and estradiol as gender-affirming hormone therapy that had resulted in desired feminization. Dr. Roberts noted that Patient 3 wished to continue estradiol therapy.

69. Throughout 2022, Dr. Roberts continued to prescribe estradiol patches and bicalutamide as a testosterone blocker to facilitate Patient 3's sex change.

70.     In 2023, Patient 3 had another appointment to discuss gender identity and gender-affirming care with Dr. Roberts.  Dr. Roberts noted again that bicalutamide and transdermal estradiol therapy had caused desired feminization in Patient 3.  Dr. Roberts switched Patient 3 to estradiol cypionate injections to avoid the patches coming loose and because Patient 3's migraines meant oral estradiol could not be prescribed.  Patient 3 expressed a desire to continue the medications, and Dr. Roberts recommended that Patient 3 continue both.

71.     Patient 3 has no diagnosed medical condition or any condition reflected in the medical records, including any endocrine disorder, that would require the administration of bicalutamide or estradiol.  Treatment for these false diseases was not medically necessary but caused significant medical risks, including that the hormone therapy would make Patient 3's migraines worse.

72.     The only basis for classifying Patient 3 as a female in medical records, for having appointments with the endocrine clinic, and for prescribing the medicines described above was to change Patient 3's sex in violation of Texas Medicaid policy.  Dr. Roberts made clear that the purpose of all of this was to conform Patient 3's appearance to that of the opposite sex.

73.     On information and belief, Dr. Roberts and TCH submitted all of this medical care for reimbursement to TCHP, which in turn included it all in encounter data provided to Texas and the federal government.

**Patient 4**

74.     Patient 4 has TCHP Star health insurance.  Patient 4 is a female who identifies as "nonbinary" and the medical records reflect a designation of "male."

75.     Patient 4 visited the TCH Endocrine Clinic at least as early as September 1, 2022, at age 16.  At that time, Patient 4 had already been on and then discontinued norethindrone to

19

suppress menstruation.  Patient 4 was already prescribed and taking testosterone, which was now suppressing menstruation, and the TCH doctor noted that Patient 4 desired to continue it.  The TCH doctor discussed the effects of testosterone therapy with Patient 4, including masculinizing effects and a reduction in female fertility, and then continued the testosterone subcutaneous injections.

76.     In 2023, Dr. Roberts had a follow-up appointment with Patient 4 at the TCH Endocrine Clinic to discuss gender identity and gender-affirming medical care.  Dr. Roberts noted that Patient 4 was tolerating the testosterone well and had experienced voice deepening and face and body hair and was happy with the changes.  Dr. Roberts increased the prescribe testosterone cypionate dose later in the year for gender dysphoria.

77.     Patient 4 has no diagnosed medical condition or any condition reflected in the medical records, including any endocrine disorder, that would require the administration of testosterone.

78.     The only basis for classifying Patient 4 as a male in medical records, for having appointments with the endocrine clinic, and for prescribing the medicines described above was to change Patient 4's sex in violation of Texas Medicaid policy.  Dr. Roberts made clear that the purpose of all of this was to conform Patient 4's appearance to that of the opposite sex.

79.     On information and belief, Dr. Roberts and TCH submitted all of this medical care for reimbursement to TCHP, which in turn included it all in encounter data provided to Texas and the federal government.

**Patient 5**

80.    Patient 5 has TCHP Star health insurance.  Patient 5 is a female who identifies as male, and the medical records reflect a designation of "non-binary."  Patient 5 was treated at TCH from at least 2020 to 2023.

81.    For a TCH appointment in 2020 when Patient 5 was 14 years old, the medical records indicate that Patient 5 was on Lupron to block estrogen and testosterone cypionate as a subcutaneous injection for two years.  Those had caused menstruation to cease, but Patient 5 was disappointed with insufficient masculinization and an only slightly deeper voice.  Patient 5 had already had a double mastectomy.  The TCH doctor recommended that the testosterone dose be increased.

82.    In 2021, Patient 5 had an office visit at which Patient 5 expressed gratitude for the medications suppressing Patient 5's menstrual cycle and for further masculinization.  Patient 5 was also happy with a deeper voice and more body hair.

83.    Throughout 2022 and 2023, Dr. Paul continued to prescribe Patient 5 with testosterone cypionate.  In 2022, Patient 5 had an office visit with Dr. Paul in which Patient 5 indicated contentment with masculinization and no menstruation.  Later that year, Patient 5 discussed testosterone with Dr. Paul, and Dr. Paul offered progesterone if necessary to ensure suppression of menstruation.

84.    In 2023, Dr. Paul again discussed testosterone with Patient 5, and Patient 5 decided to stay on injections rather than switching to transdermal patches.  They also discussed the effects of stopping testosterone but Patient 5 did not want menstruation to return or breast tissue to regrow because Patient 5 liked the effects so far and wanted to continue to obtain more facial hair.  Later that year, Dr. Paul approved testosterone cypionate refills.

85.     Patient 5 has no diagnosed medical condition or any condition reflected in the medical records, including any endocrine disorder, that would require the administration of Lupron or testosterone.

86.     The only basis for classifying Patient 5 as non-binary in medical records, for having appointments with the endocrine clinic, and for prescribing the medicines described above was to change Patient 5's sex in violation of Texas Medicaid policy.  Dr. Paul made clear that the purpose of all of this was to change the appearance of Patient 5's sex to that of the opposite sex or to appear as neither female nor male.

87.     On information and belief, Dr. Paul and TCH submitted all of this medical care for reimbursement to TCHP, which in turn included it all in encounter data provided to Texas and the federal government.

## CAUSES OF ACTION

### Count I: Violations of the Federal False Claims Act
### 31 U.S.C. §§ 3729(a)(l)

88.     The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

89.     The False Claims Act imposes liability upon any person who, inter alia, knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval or knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.  31 U.S.C. § 3729(a)(l)(A), (B).

90.     Through their conduct, TCH and Drs. Paul and Roberts knowingly caused to be submitted false claims for payment as set forth above, in violation of 31 U.S.C. § 3729(a)(l)(B). By knowingly causing to be submitted fraudulent encounter data with fraudulent diagnoses and encounter data with procedures not allowed under Texas Medicaid rules, those defendants

22

rendered TCHP's submissions materially false, causing the federal government to pay its portion of the FMAP (billions of dollars) when it would not have had it known of the fraud.

91. Additionally, those same defendants caused the federal government to pay additional money by their fraudulent submissions through Texas paying higher capitation rates (funded in part by a higher FMAP) based on past experience data with additional encounters than it otherwise would have paid had it known of the fraud.

92. TCHP knowingly submitted false claims for payment (or those to which it was reckless as to falsity), as set forth above, in violation of 31 U.S.C. § 3729(a)(l)(A). TCHP had sufficient scienter because it failed to investigate obviously false diagnoses or reconsider submissions after TCH and its doctors made clear that they were funding gender-affirming care procedures through Medicaid. The encounter data with fraudulent diagnoses and encounter data with procedures not allowed under Texas Medicaid rules that TCHP submitted and the false certifications that accompanied that data rendered TCHP ineligible to participate in Medicaid and receive any reimbursement, not the billions of dollars it received.

93. By submitting fraudulent encounter data with fraudulent diagnoses and encounter data with procedures not allowed under Texas Medicaid rules to the State, TCHP received capitation payments (partly funded by the FMAP) when it would not have had the federal government known of the fraud. Additionally, TCHP caused the federal government to pay additional money by their fraudulent submissions through Texas paying higher capitation rates (funded in part by a higher FMAP) based on past experience data with additional encounters than it otherwise would have paid had it known of the fraud.

94. These undisclosed violations were material to the federal government's decision to allow Defendants to participate in Medicaid and funding its portion of the capitation rate.

Defendants knew or reasonably should have known that the federal government could deny any capitation payment (including its FMAP) and prevent their participation in Medicaid if the violations had been known by the government.

95.    By reason of the defendants' actions, the United States has incurred damages.

**Count II: Violations of the Texas Medicaid Fraud Prevention Act**
**Tex. Hum. Res. Code § 36.002**

96.    The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

97.    Through their conduct, TCH and Drs. Paul and Roberts knowingly made or caused to be made false statements or misrepresentations of material facts to permit persons to receive benefits or payments under Medicaid that were not authorized under the Texas Medicaid programs in violation of the TMFPA.  By prescribing medicines and treating patients with procedures for purpose of effecting sex changes, those defendants submitted or caused to be submitted on behalf of patients claims for reimbursement to TCHP and other Medicaid MCOs and false information to permit the patients to receive those medicines and procedures that were not allowed under the Texas Medicaid programs.

98.    By knowingly causing to be submitted fraudulent encounter data with fraudulent diagnoses and encounter data with procedures not allowed under Texas Medicaid rules, those defendants also caused Texas to pay higher capitation rates based on past experience data with additional encounters than it otherwise would have paid had it known of the fraud, in violation of the TMFPA.

99.    By knowingly causing to be submitted fraudulent encounter data with fraudulent diagnoses and encounter data with procedures not allowed under Texas Medicaid rules, those defendants also caused to be made false statements or misrepresentations of material fact

24

concerning information (in the form of encounter data) required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to a health care program, in violation of the TMFPA.

100.     By knowingly causing to be submitted fraudulent encounter data with fraudulent diagnoses and encounter data with procedures not allowed under Texas Medicaid rules during times when TCHP had a significant profit, those defendants knowingly caused the making or use of false records or statements material to TCHP's obligations to pay or transmit money or property to Texas under a health care program and caused TCHP to unlawfully reduce the amount of profits it shared with Texas as part of experience rebates.

101.     TCHP knowingly made false statements or misrepresentations of material facts to permit persons to receive benefits or payments under Medicaid that were not authorized under the Texas Medicaid programs, in violation of the TMFPA.  TCHP had sufficient scienter because it failed to investigate obviously false diagnoses or reconsider submissions after TCH and its doctors made clear that they were funding gender-affirming care procedures through Medicaid. By knowingly submitting fraudulent encounter data with fraudulent diagnoses and encounter data with procedures not allowed under Texas Medicaid rules to Texas, TCHP also received higher capitation rates that were funded in part by Texas than it otherwise would have been paid.

102.     By knowingly submitting fraudulent encounter data with fraudulent diagnoses and encounter data with procedures not allowed under Texas Medicaid rules, TCHP also made false statements or misrepresentations of material fact concerning information (in the form of encounter data) required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to a health care program, in violation of the TMFPA.

103.    By knowingly submitting fraudulent encounter data with fraudulent diagnoses and encounter data with procedures not allowed under Texas Medicaid rules during times when TCHP had a significant profit, TCHP knowingly made or used false records or statements material to TCHP's obligations to pay or transmit money or property to Texas under a health care program and unlawfully reduced the amount of profits it shared with Texas as part of experience rebates. Similarly, TCHP knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to Texas under a health care program.

104.    These undisclosed violations were material to Texas's decision to allow Defendants to participate in Medicaid and funding its portion of the capitation rate.  Defendants knew or reasonably should have known that Texas could deny any capitation payments and prevent their participation in Medicaid if the violations had been known by Texas.  Defendants' fraud caused Texas to pay capitation payments (for billions of dollars) when Texas would not have had it known of the fraud.

105.    By reason of the defendants' actions, Texas has incurred damages.

**PRAYER FOR RELIEF**

WHEREFORE, Relator prays that this Court enter judgment against the Defendants as follows:

(a)    That the United States be awarded damages in the amount of three times the damages sustained by the United States as a result of the unlawful acts of Defendants complained of herein, as provided by the False Claims Act;

(b)    That the maximum civil penalties be imposed for each and every false claim that Defendants presented or caused to be presented to the United States;

(c)    That the State of Texas be awarded damages in the amount of each payment provided to Defendants under the Medicaid program as a result of the unlawful acts

complained of herein, plus two times the damages sustained by the State of Texas as a result of such unlawful acts, as provided by the TMFPA;

(d)    That the maximum civil penalties be imposed for each and every false claim that Defendants presented or caused to be presented to the State of Texas;

(e)    That pre- and post-judgment interest be awarded along with reasonable attorney fees, costs, and expenses incurred by Relator in bringing and prosecuting this case;

(f)    That the Court grant permanent injunctive relief to prevent any recurrence of the federal and state false claims and Medicaid fraud violations for which redress is sought in this Complaint;

(g)    That Relator be awarded the maximum amount allowed pursuant to the federal False Claims Act and the Texas Medicaid Fraud Prevention Act; and

(h)    That this Court award such other and further relief as it deems equitable, just, and proper.


Respectfully submitted this 22 day of May, 2024.

/s/ Marcella Burke
Marcella Burke
Attorney-in-charge
State Bar No. 24080734
SDTX Bar No. 1692341
Jeffrey A. Hall*
1000 Main St., Suite 2300
Houston, Texas 77002
Telephone: (832) 987-2214
Fax: (832) 793-0045
marcella@burkegroup.law

*pro hac vice application to be submitted


27