# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and the STATE OF TEXAS, *ex rel.* DOE | § § § § | CIVIL ACTION NO. 4:24-cv-02018 |
| Plaintiffs/Relator, | § § § | FILED UNDER SEAL |
| v. | § § | |
| TEXAS CHILDREN'S HOSPITAL, TEXAS CHILDREN'S HEALTH PLAN, INC., DR. DAVID L. PAUL, and DR. RICHARD OGDEN ROBERTS, III | § § § § § § | |
| Defendants. | § | |

## JOINT STIPULATION OF DISMISSAL

Pursuant to Fed. R. Civ. P. 41(a), the False Claims Act, 31 U.S.C. §§ 3729-33, and the Texas Health Care Program Fraud Prevention Act, Tex. Hum. Res. Code § 36.102(e), and consistent with the settlement agreement dated July 24, 2026 ("the United States Settlement Agreement") between the United States, the Defendants in this action, and Relator ("Relator"), and the settlement agreement dated July 27, 2026, ("the Texas Settlement Agreement") between the State of Texas, the Defendants in this action, and Relator, the United States and the State of Texas, having intervened in this *qui tam* action, and Relator jointly dismiss all claims asserted by Relator in this action on behalf of the United States and all claims asserted by Relator in this action on behalf of the State of Texas, as set forth below.

In accordance with, and subject to the terms of, the United States Settlement Agreement, the United States and Relator dismiss, with prejudice, all claims asserted by Relator on behalf of the United States in this action (EXHIBIT A).

In accordance with, and subject to the terms of, the Texas Settlement Agreement, the State of Texas and Relator dismiss, with prejudice, all claims asserted by Relator on behalf of the State of Texas in this action (EXHIBIT B).

A proposed order accompanies this Stipulation of Dismissal and the United States' and the State of Texas' Notice of Election to Intervene.

Respectfully submitted,

**BRETT A. SHUMATE**
ASSISTANT ATTORNEY GENERAL
CIVIL DIVISION

**AARON F. REITZ**
UNITED STATES ATTORNEY

*/s/ Jill O. Venezia*
**JILL O. VENEZIA**
Attorney-In-Charge
Assistant United States Attorney
Texas Bar No. 24010764
Southern District of Texas Bar No. 31305

**MICHELLE LUONG**
Assistant United States Attorney
Texas Bar No. 24098021
Southern District of Texas Bar No. 3341578
1000 Louisiana, Suite 2300
Houston, Texas 77002
Telephone: (713) 567-9511
Facsimile: (713) 718-3309
Email: Jill.Venezia@usdoj.gov

*/s/ Jill O. Venezia by permission for*
**JAMIE ANN YAVELBERG**
**ANDY J. MAO**
**KIRSTEN V. MAYER**
United States Department of Justice
Civil Division, Fraud Section
175 N Street, NE
Room 10.1304

2

Washington, DC 20002
Telephone: (202) 674-0164
Email: Kirsten.Mayer@usdoj.gov

ATTORNEYS FOR THE UNITED STATES


**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Civil Litigation

*/s/ Amy S. Hilton*
**AMY SNOW HILTON**
Chief, Healthcare Program Enforcement Division
Texas Bar No. 24097834

**KATHERINE PITCHER**
Assistant Attorney General
Texas Bar No. 24143894

**JONATHAN VOOS**
Assistant Attorney General
Texas Bar No. 24149471

Office of the Attorney General of Texas
Healthcare Program Enforcement Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: (512) 463-2100
Fax: (512) 499-0712
Amy.Hilton@oag.texas.gov

**Counsel for the State of Texas**

# Exhibit A

<u>SETTLEMENT AGREEMENT</u>

This Settlement Agreement (Agreement) is entered into among the United States of America, acting through the United States Department of Justice and on behalf of the Office of Inspector General of the Department of Health and Human Services ("OIG-HHS"), (collectively, the "United States"), Texas Children's Hospital ("TCH"), TCH Pediatrics Associates, Inc. d/b/a Texas Children's Pediatrics ("TCP"), Texas Children's Health Plan, Inc. ("TCHP"), Texas Children's Physician Group d/b/a Texas Children's Physician Services Organization ("TCPG") (collectively "Texas Children's Providers"), and Vanessa Sivadge (Relator), (hereafter collectively referred to as "the Parties"), through their authorized representatives.

<u>RECITALS</u>

A.     Texas Children's Hospital is a Texas nonprofit corporation that operates pediatric hospitals, clinics, and other facilities.  Its main campus is in Houston, Texas.  Texas Children's Health Plan is a Texas nonprofit corporation and health maintenance organization providing Medicaid coverage in Texas.  TCH is an affiliate of TCHP.  Texas Children's Pediatrics is a Texas certified nonprofit health organization that is affiliated with TCH and operates a pediatric primary care network.  Texas Children's Physicians Group is a Texas nonprofit health organization that contracts with and employs a network of providers who provide services at TCH's pediatric hospitals, clinics, and facilities.

B.     On May 22, 2024, Relator filed a qui tam action in the United States District Court for the Southern District of Texas captioned *United States ex rel. Doe v. Texas Children's Hospital, at al.*, Civil Action No. 4:24-cv-02018, pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. § 3730(b) (the "Civil Action").

C.     The United States contends that the Texas Children's Providers submitted or caused to be submitted claims for payment to the Medicaid Program, 42 U.S.C. §§ 1396-


GOVERNMENT EXHIBIT

A

1396w-5 ("Medicaid"), Healthy Texas Women, and the Children's Health Insurance Program ("CHIP").

D.    The United States contends that it has certain civil claims against the Texas Children's Providers arising from the following conduct. From January 1, 2016, through the Effective Date of this Agreement, the Texas Children's Providers knowingly submitted claims for payment or knowingly caused to be submitted claims for payment to Texas Medicaid, Healthy Texas Women, and Texas CHIP and Texas Children's Health Plan knowingly paid or caused to be paid claims on behalf of Texas Medicaid and Texas CHIP, with false diagnosis codes for items or services provided to patients to treat the patients' gender dysphoria or other gender identity related disorders. The Texas Children's Providers used false ICD-10 codes instead of an accurate primary diagnosis code allegedly to obscure the true reasons for the items and services provided to the patients. That conduct is referred to below as the "Covered Conduct."

E.    This Settlement Agreement is neither an admission of liability by the Texas Children's Providers nor a concession by the United States that its claims are not well founded.

F.    Relator claims entitlement under 31 U.S.C. § 3730(d) to a share of the proceeds of this Settlement Agreement and to Relator's reasonable expenses, attorneys' fees and costs.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

<u>TERMS AND CONDITIONS</u>

1.    The Texas Children's Providers shall pay to the United States $1,424,000 inclusive of civil penalties (Settlement Amount), of which $570,000 is restitution, no later than ten (10) calendar days after the Effective Date of this Agreement by electronic funds transfer

2

pursuant to written instructions to be provided by the Civil Division of the United States Department of Justice.

2.      Conditioned upon the United States receiving the Settlement Amount and as soon as feasible after receipt, the United States shall pay $284,800 to Relator by electronic funds transfer (Relator's Share).

3.      Subject to the exceptions in Paragraph 5 (concerning reserved claims) below, and upon the United States' receipt of the Settlement Amount, the United States releases the Texas Children's Providers, together with their respective parents, subsidiaries, affiliates, physicians, employees, independent contractors (including physicians who have assigned their rights to bill and collect to a Texas Children's Provider), and agents, for services billed by the Texas Children's Providers, from any civil or administrative monetary claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; or the common law theories of payment by mistake, unjust enrichment, and fraud.

4.      The terms and releases related to the settlement of Relator's attorneys' fees, expenses and costs pursuant to 31 U.S.C. § 3730(d) are not provided for herein but are instead the subject of separate agreement between Relator, Relator's counsel, and the Texas Children's Providers.

5.      Notwithstanding the releases given in Paragraph 3 of this Agreement, or any other term of this Agreement, the following claims and rights of the United States are specifically reserved and are not released:

   a.      Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

   b.      Any criminal liability;

c.  Except as explicitly stated in this Agreement, any administrative liability or enforcement right;

d.  Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

e.  Any liability based upon obligations created by this Agreement.

6.  Relator and her heirs, successors, attorneys, agents, and assigns shall not object to this Agreement but agree and confirm that this Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B).  Conditioned upon Relator's receipt of the Relator's Share, Relator and her heirs, successors, attorneys, agents, and assigns fully and finally release, waive, and forever discharge the United States, its agencies, officers, agents, employees, and servants, from any claims arising from the filing of the Civil Action or under 31 U.S.C. § 3730, and from any claims to a share of the proceeds of this Agreement and/or the Civil Action.

7.  The Texas Children's Providers waive and shall not assert any defenses the Texas Children's Providers may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

8.  The Texas Children's Providers fully and finally release the United States, its agencies, officers, agents, employees, and servants, from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that the Texas Children's Providers have asserted, could have asserted, or may assert in the future against the United States, its

agencies, officers, agents, employees, and servants, related to the Covered Conduct or the United States' investigation or prosecution thereof.

9. Relator fully and finally releases the United States from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Relator has asserted, could have asserted, or may assert in the future against the Relator, related to the Covered Conduct and the allegations set forth in the qui tam complaint, and the Relator's investigation and prosecution thereof.

10. The Settlement Amount shall not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare or Medicaid contractor (e.g., Medicare Administrative Contractor, fiscal intermediary, carrier) or any state payer, related to the Covered Conduct; and the Texas Children's Providers agree not to resubmit to any Medicare or Medicaid contractor or any state payer any previously denied claims related to the Covered Conduct, agree not to appeal any such denials of claims, and agree to withdraw any such pending appeals.

11. The Texas Children's Providers agree to the following:

a. Unallowable Costs Defined: All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47; and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395lll and 1396-1396w-5; and the regulations and official program directives promulgated thereunder) incurred by or on behalf of the Texas Children's Providers, its present or former officers, directors, employees, shareholders, and agents in connection with:

(1) the matters covered by this Agreement;

(2) the United States' audit(s) and civil investigation of the matters covered by this Agreement; the Texas Children's Providers' investigation, defense,

and corrective actions undertaken in response to the United States' audit(s) and civil investigation(s) in connection with the matters covered by this Agreement (including attorneys' fees);

(4)     the negotiation and performance of this Agreement;

(5)     the payment the Texas Children's Providers make to the United States pursuant to this Agreement and any payments that the Texas Children's Providers may make to Relator, including costs and attorneys fees,

are unallowable costs for government contracting purposes and under the Medicare Program, Medicaid Program, TRICARE Program, and Federal Employees Health Benefits Program (FEHBP) (hereinafter referred to as Unallowable Costs).

b.     <u>Future Treatment of Unallowable Costs</u>:  Unallowable Costs shall be separately determined and accounted for by the Texas Children's Providers, and the Texas Children's Providers shall not charge such Unallowable Costs directly or indirectly to any contracts with the United States or any State Medicaid program, or seek payment for such Unallowable Costs through any cost report, cost statement, information statement, or payment request submitted by the Texas Children's Providers or any of their subsidiaries or affiliates to the Medicare, Medicaid, TRICARE, or FEHBP Programs.

c.     <u>Treatment of Unallowable Costs Previously Submitted for Payment</u>: The Texas Children's Providers further agree that within 90 days of the Effective Date of this Agreement they shall identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and Medicaid and FEHBP fiscal agents, any Unallowable Costs (as defined in this paragraph) included in payments previously sought from the United States, or any State Medicaid program, including, but not limited to, payments sought in any cost reports, cost

statements, information reports, or payment requests already submitted by the Texas Children's Providers or any of their subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the Unallowable Costs. The Texas Children's Providers agree that the United States, at a minimum, shall be entitled to recoup from the Texas Children's Providers any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted cost reports, information reports, cost statements, or requests for payment.

Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or the affected agencies. The United States reserves its rights to disagree with any calculations submitted by the Texas Children's Providers or any of their subsidiaries or affiliates on the effect of inclusion of Unallowable Costs (as defined in this paragraph) on the Texas Children's Providers or any of their subsidiaries or affiliates' cost reports, cost statements, or information reports.

d. Nothing in this Agreement shall constitute a waiver of the rights of the United States to audit, examine, or re-examine the Texas Children's Providers' books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this paragraph.

12. The Texas Children's Providers agree to cooperate fully and truthfully with the United States' investigation of individuals and entities not released in this Agreement. Upon reasonable notice, the Texas Children's Providers shall encourage, and agree not to impair, the cooperation of its directors, officers, and employees, and shall use its best efforts to make available, and encourage, the cooperation of former directors, officers, and employees for interviews and testimony, consistent with the rights and privileges of such individuals. The

Texas Children's Providers further agree to furnish to the United States, upon request, complete and unredacted copies of all non-privileged documents, reports, memoranda of interviews, and records in its possession, custody, or control concerning any investigation of the Covered Conduct that it has undertaken, or that has been performed by another on its behalf.

13. This Agreement is intended to be for the benefit of the Parties only. The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraph 14 (waiver for beneficiaries paragraph), below.

14. The Texas Children's Providers agree that they waive and shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third party payors based upon the claims defined as Covered Conduct.

15. Upon receipt of the payment described in Paragraph 1, above, the Parties shall promptly sign and file in the Civil Action a Joint Stipulation of Dismissal of the Civil Action pursuant to Rule 41(a)(1).

16. Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

17. Each party and signatory to this Agreement represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

18. This Agreement is governed by the laws of the United States. The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the Southern District of Texas. For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

19. This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

20. The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

21. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

22. This Agreement is binding on the Texas Children's Providers' successors, transferees, heirs, and assigns.

23. This Agreement is binding on Relator's successors, transferees, heirs, and assigns.

24. All Parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

25. This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement). Facsimiles and electronic transmissions of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

<strong><u>THE UNITED STATES OF AMERICA</u></strong>

DATED: 7/18/26     BY: _____

                                          BRETT SHUMATE
                                          Assistant Attorney General
                                          Civil Division
                                          United States Department of Justice

DATED: 7/8/2026     BY: _____

                                          JOHN G.E. MARCK
                                          Acting United States Attorney
                                          United States Attorney's Office for the
                                          Southern District of Texas

DATED: _____     BY: _____

SUSAN GILLIN
Digitally signed by SUSAN GILLIN
Date: 2026.07.20 10:01:30 -04'00'

                                          SUSAN E. GILLIN
                                          Assistant Inspector General for Legal Affairs
                                          Office of Counsel to the Inspector General
                                          Office of Inspector General
                                          United States Department of Health and Human Services

**THE TEXAS CHILDREN'S PROVIDERS**

DATED: 7/21/2026        BY: _____

David L. Stockel
Deputy General Counsel
Texas Children's Hospital


DATED: 7/21/2026        BY: _____

David L. Stockel
Deputy General Counsel
Texas Children's Health Plan, Inc.


DATED: 7/21/2026        BY: _____

David L. Stockel
Deputy General Counsel
TCH Pediatrics Associates, Inc. d/b/a
Texas Children's Pediatrics


DATED: 7/21/2026        BY: _____

David L. Stockel
Deputy General Counsel
Texas Children's Physician's Group d/b/a
Texas Children's Physician Services Organization


DATED: 7/21/2026        BY: _____

Cliff Stricklin
King & Spalding LLP
Counsel for the Texas Children's Providers

Docusign Envelope ID: 4C5FE3E3-C4C8-88D5-826E-2E16A776DCD0

## VANESSA SIVADGE - RELATOR

Signed by:

DATED: 7/24/2026    BY: *Vanessa Sivadge*
D2A060B111C749D...
VANESSA SIVADGE

Signed by:

DATED: 7/23/2026    BY: **Marcella Burke**
B8ECD7D2552141A...
MARCELLA BURKE
Burke Law Group
Counsel for Relator

12

# Exhibit B

# SETTLEMENT AGREEMENT

## I. PARTIES

This Settlement Agreement ("Agreement") is entered into among the State of Texas, acting through the Office of the Attorney General of Texas ("OAG"); the United States of America, acting through the United States Department of Justice ("DOJ"); Texas Children's Hospital ("TCH"), TCH Pediatrics Associates, Inc. d/b/a Texas Children's Pediatrics ("TCP"), Texas Children's Health Plan, Inc. ("TCHP"), Texas Children's Physician Group d/b/a Texas Children's Physician Services Organization ("TCPG"); and Vanessa Sivadge ("Relator"), (hereafter collectively referred to as "the Parties"), through their authorized representatives.

## II. RECITALS

A.    TCH is a Texas nonprofit corporation that owns and operates pediatric hospitals, clinics, and other facilities. Its main campus is in Houston, Texas. TCHP is a Texas nonprofit corporation and health maintenance organization providing Medicaid coverage in Texas. TCH is an affiliate of TCHP. TCPG is a Texas certified nonprofit health organization that contracts with and employs providers who provide services at TCH pediatric hospitals, clinics, and facilities. TCP is a Texas certified nonprofit health organization that is affiliated with TCH and operates a pediatric primary care network. TCH, TCP, and TCPG are collectively referred to as the "Texas Children's Providers."

B.    "The Government" means the State of Texas and the United States.

C.    The "TCH Released Parties" means TCH, TCHP, TCPG, TCP, and their respective parents, subsidiaries, affiliates, physicians, employees, independent contractors (including physicians who have assigned their rights to bill and collect to TCH, TCP, or TCPG), and agents.

D.    On May 22, 2024, Relator filed a qui tam action in the United States District Court for the Southern District of Texas captioned *United States ex rel. Doe v. Texas Children's Hospital,*


GOVERNMENT EXHIBIT

B

PENGAD 800-631-6989

*et al.*, Civil Action No. 4:24-cv-02018, pursuant to the qui tam provisions of the Texas Health Care

Program Fraud Prevention Act, Tex. Hum. Res. Code § 36.101 (the "Civil Action").

E.      The Government contends that it has certain civil claims against the Texas

Children's Providers arising from the conduct described below.

F.      "Sex-Rejecting Procedures" means any medical, surgical, or pharmaceutical

intervention provided to an individual that is intended to suppress, alter, or eliminate endogenous

pubertal development, or to modify primary or secondary sex characteristics, for the purpose of

aligning with or affirming an individual's asserted gender identity rather than the individual's sex,

where such intervention would not otherwise be indicated for a congenital, pathological, or non-

mental disorder or disease-related condition. These include, but are not limited to:

(a) Puberty suppression: prescription or administration of gonadotropin-releasing hormone (GnRH) agonists or antagonists or functionally equivalent agents, intended to pause or suppress pubertal progression.

(b) Hormone administration: prescription or administration of estrogen, testosterone, or synthetic analogs, or any other medication which blocks or otherwise inhibits the effects of the body's natural production of sex hormones, in a manner intended to induce physical traits associated with the opposite sex or to suppress traits associated with the individual's sex.

(c) Surgical interventions: any surgical procedure intended to alter, remove, or reconstruct primary or secondary sex characteristics, including but not limited to mastectomy, breast augmentation, genital reconstruction or modification, hysterectomy, oophorectomy, orchiectomy, phalloplasty, vaginoplasty, and other surgeries performed primarily to approximate sex-typical appearance.

(d) Voice modification interventions: clinical interventions intended to masculinize or feminize a person's voice to approximate sex-typical vocal characteristics, including but not limited to speech-language therapy when undertaken to alter pitch, resonance, intonation, or speech patterns to align with a gender identity or pharmacological, surgical, or procedural interventions to affect the larynx, vocal cords, or related structures to modify sex-typical voice characteristics.

(e) Other ancillary or preparatory interventions provided in connection with any medical or clinical services described in the above sections (a)-(d).

G.      An intervention is considered a Sex-Rejecting Procedure based on its intended purpose, and not on the terminology or classification used by a health care provider or facility.

H.      "Masking Conduct" means the use of false diagnosis codes for items or services provided to patients to treat the patients' gender dysphoria or other gender identity related disorder, including by using false ICD-10 codes instead of accurate primary diagnosis codes to obscure the true reasons for the items and services provided to the patients.

I.      "Misbranding and Commercial Insurance Plan Conduct" means (1) fraudulently billing commercial insurance plans for "medically unnecessary" drugs to treat gender dysphoria where the patients did not meet criteria for reimbursement as set by certain commercial plans; and (2) (i)  causing certain drugs to be misbranded by distributing or providing to patients (or their parents or legal guardians) labeling for such drugs that was false or misleading; (ii) causing the drugs to become misbranded while held for sale because their labeling lacked adequate directions for their intended use; (iii) participating, facilitating, or otherwise conspiring with pharmaceutical manufacturers to introduce or cause the introduction of misbranded drugs into interstate commerce; and/or (iv) participating in schemes to receive remuneration from pharmaceutical manufacturers to induce the generation of business (i.e., kickback schemes) based on the off-label sales of such manufacturers' puberty-suppressing drugs or cross-sex hormones.

J.      "Covered Conduct" includes (1) the Masking Conduct and Sex-Rejecting Procedures for claims submitted, caused to be submitted—or paid or caused to be paid by Government funds—by the TCH Released Parties on and between January 1, 2010 through the Effective Date of this Agreement and (2) the Misbranding and Commercial Insurance Plan Conduct on and between January 1, 2010 through the Effective Date of this Agreement.

K.     The Government alleges that TCH, TCHP, TCPG, and TCP, through certain individual employees and agents, submitted, caused to be submitted claims for payment, or paid or caused to be paid claims for payment for items and services provided in connection with Sex-Rejecting Procedures to insurance plans and payors, including Texas Medicaid and Texas Medicaid managed care organizations. The Government alleges that certain of these claims for payment involved Masking Conduct which failed to appropriately reflect that the items and services for which claims were submitted were provided for the purpose of Sex-Rejecting Procedures. The United States also alleges that the Texas Children's Providers may have engaged in fraudulent billing practices by making gender dysphoria diagnoses and/or by billing commercial insurance plans for medically unnecessary drugs to treat gender dysphoria where the patients did not meet the criteria for reimbursement as set by certain commercial insurance plans. Additionally, the United States has been investigating whether the Texas Children's Providers or certain of their agents, representatives, or employees violated provisions of the Federal Food, Drug, and Cosmetic Act: 21 U.S.C. § 301 *et seq.* ("FDCA"), 18 U.S.C. § 371, and 42 U.S.C. § 1320a-7b by: (i) causing certain drugs to be misbranded by distributing or providing to patients (or their parents or legal guardians) labeling for such drugs that was false or misleading; (ii) causing the drugs to become misbranded while held for sale because their labeling lacked adequate directions for their intended use; (iii) participating, facilitating, or otherwise conspiring with pharmaceutical manufacturers to introduce or cause the introduction of misbranded drugs into interstate commerce; and/or (iv) participating in schemes to receive remuneration from pharmaceutical manufacturers to induce the generation of business (i.e., kickback schemes) based on the off-label sales of such manufacturers' puberty-suppressing drugs or cross-sex hormones.

L.       This Settlement Agreement is neither an admission of liability by the TCH Released Parties nor a concession by either the State of Texas or the United States that their claims are not well founded. The TCH Released Parties do not admit to any wrongdoing or that they engaged in the Covered Conduct.

M.       Relator claims entitlement under Tex. Hum. Res. Code § 36.110 to a share of the proceeds of this Settlement Agreement and to Relator's reasonable expenses, attorneys' fees, and costs. Relator's reasonable expenses, attorneys' fees, and costs are not included in or part of this Settlement Agreement.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation, to protect the privacy of patient records, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

### III. TERMS AND CONDITIONS

1.       The Texas Children's Providers shall pay to the State of Texas $8,576,000 inclusive of civil penalties (the "Settlement Amount"), of which $3,719,459 is restitution, no later than ten (10) calendar days after the Effective Date of this Agreement by electronic funds transfer pursuant to written instructions to be provided by the Office of the Attorney General of Texas.

2.       Conditioned upon the State of Texas receiving the Settlement Amount and as soon as feasible after receipt, the State of Texas shall pay $1,715,200 to Relator by electronic funds transfer ("Relator's Share").

3.       The Relator's reasonable expenses, attorneys' fees, and costs shall be paid separately by the Texas Children's Providers.

4.       The Relator's Share will come exclusively out of the Settlement Amount.

5.       Subject to the exceptions in Paragraph III.7 (concerning excluded claims) below, and conditioned upon the Texas Children's Providers' full payment of the Settlement Amount

pursuant to Paragraph III.1, the State of Texas and the United States release the TCH Released Parties from any civil, administrative, and criminal claims or liabilities the State of Texas or the United States has or may have for or related to the Covered Conduct under Tex. Hum. Res. Code § 36.001 *et seq.* (the "THFPA"), Tex. Health & Safety Code § 161.702, Tex. Bus. & Comm. Code § 17.41 *et seq.*; 18 U.S.C. §§ 287, 371, 664, 666, 1001, 1027, 1035, 1341, 1343, 1347, 1349, and 1954; 21 U.S.C. § 331 (the "Released Claims"). As to the State of Texas, the Released Claims also include any administrative sanctions or claims for permissive exclusion related to the Covered Conduct.

6.      Upon the State of Texas's receipt of the Settlement Amount, Relator, for herself and her heirs, successors, attorneys, agents, and assigns, releases the TCH Released Parties from any civil remedy the Relator has on behalf of the State of Texas related to the Covered Conduct under the THFPA, other than Relator's reasonable expenses, attorneys' fees, and costs.

7.      Notwithstanding the releases given in Paragraph 5 of this Agreement, or any other term of this Agreement, the following claims of the State of Texas and the United States, as applicable, are specifically reserved and are not released:

a.  Any civil, criminal, or administrative liability arising under Title 26, U.S. Code (Internal Revenue Code) or any state tax or revenue law or codes;

b.  Except as explicitly stated in this Agreement, any administrative liability or enforcement;

c.  With respect to the United States, any liability under the False Claims Act;

d.  Except as explicitly stated in this Agreement, any criminal liability;

e.  Except as explicitly stated in this Agreement, any liability of individuals;

f.  Any liability to the State of Texas, the United States, or their agencies for any conduct other than the Covered Conduct;

g.  The subrogation rights to claims for personal injury arising from the usage of any of the TCH Released parties' products or services;

h.  Any current or future claim based on a failure by the TCH Released Parties to deliver products or services due;

i.  Any liability based upon obligations created by this Agreement.

8.  Relator and her heirs, successors, attorneys, agents, and assigns shall not object to this Agreement but agree and confirm that this Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to Tex. Hum. Res. Code § 36.107. Conditioned upon Relator's receipt of the Relator's Share, Relator and her heirs, successors, attorneys, agents, and assigns fully and finally release, waive, and forever discharge the State of Texas, the United States, and their agencies, officers, agents, employees, and servants from any claims arising from the filing of the Civil Action or under Tex. Hum. Res. Code § 36.001 *et seq.*, and from any claims to a share of the proceeds of this Agreement and/or the Civil Action.

9.  The TCH Released Parties waive and shall not assert any defenses the TCH Released Parties may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

10.  The TCH Released Parties fully and finally release the State of Texas, the United States, and their agencies, officers, agents, employees, and servants, from any claims (including

attorney's fees, costs, and expenses of every kind and however denominated) that the TCH Released Parties have asserted, could have asserted, or may assert in the future against the State of Texas, the United States, their agencies, officers, agents, employees, and servants, related to the Covered Conduct or the State of Texas's and the United States' investigation and prosecution thereof.

11.     Relator fully and finally releases the State of Texas and the United States from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Relator has asserted, could have asserted, or may assert in the future against the State of Texas or the United States, related to the Covered Conduct and the allegations set forth in the Civil Action, and the Relator's investigation and prosecution thereof.

12.     **Compliance Terms**. The TCH Released Parties agree to the following compliance commitments. Except as otherwise stated, these obligations shall commence as of the Effective Date or as otherwise stated herein and remain in effect through June 30, 2032. The TCH Released Parties' agreement to these compliance commitments represents a condition precedent to the release of the Government's claims:

   a. **Permanent Cessation of Sex-Rejecting Procedures**. TCH, TCPG, TCHP, and TCP agree on behalf of themselves, their subsidiaries, parents, and affiliates (collectively, "TCH Affiliated Entities") over which they have control to permanently and irrevocably cease providing, directly or indirectly, any Sex-Rejecting Procedures, absent a change in the law requiring TCH Affiliated Entities to provide such procedures. The scope of this prohibition (i) includes referrals and facilitation; (ii) includes performing such procedures through any entity or provider over which any TCH Affiliated Entity has control; (iii) includes circumvention of the foregoing through

any third-party by any TCH Affiliated Entity (or any TCH Affiliated Entity personnel acting within the course and scope of their duties for such TCH Affiliated Entity). TCH Affiliated Entities agree that they shall immediately cease and refrain from referring, directing, recommending, coordinating, or facilitating Sex-Rejecting Procedures by any third party or external provider, whether within or outside of the TCH system. TCH Affiliated Entities must prohibit Sex-Rejecting Procedures from being performed at any facility that any TCH Affiliated Entity controls, absent a change in the law requiring TCH Affiliated Entities to provide such procedures. This obligation applies regardless of the source of payment, clinical setting, or referral pathway, and includes any such services provided through employees, contractors, affiliated physicians, or third-party arrangements. Any violation of this paragraph shall constitute a material breach of this Agreement. TCH Affiliated Entities may not evade this obligation through reclassification, relabeling, or modification of services that are substantively Sex-Rejecting Procedures.

b.  The TCH Affiliated Entities will not own or operate healthcare facilities that provide Sex-Rejecting Procedures, consistent with the same commitments as set out in Paragraph III.12(a) above.

c.  **Formal Written Policy**. TCH Affiliated Entities shall adopt a formal written policy within thirty (30) days of the Effective Date of this Agreement prohibiting all Sex-Rejecting Procedures, including prescribing, ordering, or performing prescription medications and surgical procedures as Sex-Rejecting Procedures. This specifically includes menstrual suppression drugs prescribed as a Sex-Rejecting Procedure. This formal written policy must be communicated and disseminated as standard practice for

all system policies, including posting on the TCH system-wide intranet platform. This section shall extend in perpetuity, absent a change in the law requiring TCH to provide such procedures.

d. **Public Statement**. Within 14-days of the Effective Date, the Texas Children's Providers shall issue a public statement (the "Public Statement"), as set forth in Exhibit A, which expressly acknowledges the following:

    i. The Texas Children's Providers performed Sex-Rejecting Procedures on both minor and adult patients;

    ii. The removal and supersession of TCH's prior media statements related to the Texas Children's Providers' provision of Sex-Rejecting Procedures and Masking Conduct, including the media statement posted by TCH on May 15, 2026, related to this Agreement and the Government's investigations (the "Superseded Press Releases"); and

    iii. The Texas Children's Providers and TCH Affiliated Entities have permanently and irrevocably ceased the provision, directly or indirectly, of any Sex-Rejecting Procedures, absent a change in the law requiring TCH to provide such procedures.

e. Neither the Texas Children's Providers nor TCHP shall publish, cause to be published, or recirculate any Superseded Press Release or statement contradictory to the Public Statement; provided, however, that nothing shall prohibit the Texas Children's Providers from posting, publishing, issuing, or otherwise making statements that do not contradict or disavow the Public Statement in response to litigation, media releases, public comments, or public statements. TCH shall not remove, archive, or render inaccessible the Public Statement from its website for a period of 15-years from its release within 14-days of the Effective Date.

f. **By-Law Amendments**. Within 60-days of the Effective Date of this Agreement, TCH shall recommend to the medical staff the adoption of an amendment to the medical staff bylaws that specifies that a violation of the TCH Affiliated Entities' policy prohibiting

Sex-Rejecting Procedures is a trigger for "Automatic Relinquishment of Privileges." "Automatic Relinquishment of Privileges" means the automatic relinquishment of clinical privileges held by a practitioner upon the occurrence of a triggering event, without any rights to a hearing or appellate review under the medical staff bylaws. The amendment must specify that Automatic Relinquishment of privileges based on conduct that violates the TCH Affiliated Entities' policy prohibiting Sex-Rejecting Procedures or Tex. Health & Safety Code § 161.702 cannot be removed, such that the practitioner could be reinstated. The failure to adopt the amendment within ninety (90) days constitutes a breach of the Agreement. The obligations imposed in this section shall extend in perpetuity, absent a change in the law requiring TCH to provide Sex-Rejecting Procedures.

g. **Revocation of Privileges**. As a material term of this Settlement Agreement, TCH shall permanently and irrevocably terminate all existing privileges, clinical privileges, and staff appointments previously granted to three specifically agreed upon current physicians (collectively, "Current Physicians") within ninety (90) days of the Effective Date, as identified in Exhibit B. The Texas Children's Providers further agree that two former physicians (collectively, "Former Physicians") shall be permanently ineligible to apply for, receive, hold, or exercise, directly or indirectly, any credentials or privileges at any current or future facility owned, operated, managed, under the control of, or affiliated with TCH. The Current Physicians and Former Physicians are identified in Exhibit B. This prohibition includes but is not limited to: (i) admitting privileges of any class or category; (ii) clinical privileges of any scope or specialty; (iii) medical staff membership or appointment; or (iv) any other form of credentialing, privileging, or

authorization to practice medicine or provide any clinical services. For avoidance of doubt, the obligations set forth in this section shall be binding in perpetuity and without geographic limitations. The Parties' press releases and other public comments will not identify the Current Physicians or Former Physicians by name, nor any other providers involved in providing Sex Rejecting Procedures at TCH facilities ("Transgender Care Team"), including any surgeons who performed histrelin implants for gender-transition purposes.

h. **Written Warnings and Counseling**. Within 30-days of the Effective Date, TCH shall provide written warnings and counseling to all providers involved in TCH's Transgender Care Team and all surgeons who performed histrelin implants for gender-transition purposes. Upon request, TCH shall provide the Government with a list of the providers in the Transgender Care Team and surgeons who received written warnings and counseling. TCH shall meet-and-confer with the Government in good faith to verify that all persons involved in TCH's Transgender Care Team and all surgeons who performed histrelin implants for gender-transition purposes have received the required written warnings and counseling. TCH agrees to supplement the scope of practitioners subject to written warnings and counseling upon the Government's request as a result of the meet-and-confer process.

i. **Compliance Department Annual Review**. TCH's Compliance Department shall perform an annual review of services provided by all physicians involved in TCH's Transgender Care Team, including all surgeons who performed histrelin implants for gender-transition purposes, to ensure compliance with applicable policy and state law. This review must include verification that TCH's electronic medical records maintain

patients' biological sex, in conformance with Tex. Health & Safety Code § 183.007, such that Sex-Rejecting Procedures can be identified by reference to patients' biological sex. The annual review shall include all physicians involved in TCH's Transgender Care Team, and TCH shall cooperate with the Government in good faith to verify the completeness of the scope of the providers subject to the annual review. Upon request, TCH shall provide the Government with a list of the providers who will be—or have been—subject to the annual review, and the results thereof. TCH agrees to supplement the scope of practitioners subject to the annual review of services upon the Government's request, as a result of the meet-and-confer process described in Paragraph III.12.h above. The obligations imposed in this section shall remain in force for a period of 10-years from the Effective Date.

j. **"Break the Glass" Patient List**. TCH shall maintain a confidential, access-restricted patient list (the "Break the Glass List" or "BTG List"), which shall include all patients—regardless of payor type, including without limitations patients covered by commercial insurance, Medicare, Medicaid, CHIP, or any other governmental payor program—who have one or more ICD-10 diagnosis codes within the F64.xx code category (Gender Identity Disorders/Gender Dysphoria) appearing anywhere in such patient's medical records or claims history maintained by or accessible to TCH. The obligations imposed in this section shall remain effective for a period of 10-years.

k. **Potential GAC Patient List.** In addition to the F64.xx codes specified in subsection (j), TCH shall create a supplemental "Potential GAC Patient List" within 30-days of the Effective Date to include any patient who has one or more diagnosis codes, however denominated, appearing in such patient's medical records or claims history that are

identified in Exhibit C to this Agreement ("OAG Designated Codes"). Within thirty (30) days of the Effective Date, TCH shall query its full medical records and claims history, including records predating the Effective Date of this Agreement, to identify all patients with any OAG Designated Codes in their history, and shall add all such patients to the Potential GAC Patient List. The obligations in this section shall remain effective for a period of 10-years.

l. **Dynamic Refresh Obligation**. The Break the Glass List and Potential GAC Patient List (collectively, the "Patient Lists") shall be a living and dynamic list of patients. TCH shall refresh and update the Patient Lists no less frequently than once per calendar month (the "Minimum Refresh Interval") such that:

    i. Any patient whose records or claims history are newly coded with an F64.xx diagnosis code or an OAG Designated Code during the preceding period is added to the Patient Lists no later than the next scheduled refresh;

    ii. No patient on the Patient Lists (each a "BTG Patient") shall be removed from the Patient Lists; and

    iii. TCH shall maintain evidence of each monthly refresh, capturing the date of refresh, the number of patients added to the Patient Lists.

m. **Prohibition on Removal of Patients from the Patient Lists**. Once a BTG Patient is added to the Patient Lists, the BTG Patient shall not be removed from the Patient Lists irrespective of any change to a BTG Patient's medical record, billing record, claims record, or electronic health record entry pertaining to any BTG Patient (collectively, "BTG Patient Records"), including without limitation:

    i. Any F64.xx diagnosis code entry or related clinical notation;

    ii. Any record of a Sex-Rejecting Procedure performed on such BTG Patient; or

iii. Any other entry in such BTG Patient's record that relates to, references, or documents gender identity, gender dysphoria, or the provision of Sex-Rejecting Procedures.

n. **Access Restrictions to Patient Lists**. Any access to the Patient Lists shall require affirmative, logged authorization, which shall capture: (A) the identity of the individual accessing the record; (B) the date and time of access; (C) the stated reason for access; and (D) the supervising authority who approved such access.

o. **Obligation to Conduct Annual Review**. TCH's Chief Compliance Officer shall oversee a comprehensive annual review of the Patient Lists (the "Annual Compliance Review"), for the purpose of confirming TCH's compliance with:

i. All applicable state and federal laws, regulations, and guidance, including without limitation Tex. Health & Safety Code § 161.701 *et seq.*; and

ii. All obligations set forth in this Agreement with respect to the Patient Lists, and the obligations set forth in this Agreement in paragraphs III.12(a) and III.12(c) with respect to the permanent cessation of Sex-Rejecting Procedures and TCH's formal written policy prohibiting same.

The obligations in this section shall remain effective for a period of 10-years.

p. **Electronic Medical Records**. TCH's Compliance Department shall perform an annual review to verify that TCH's electronic medical records maintain patients' biological sex, in conformance with Tex. Health & Safety Code § 183.007, such that Sex-Rejecting Procedures can be identified by reference to patients' biological sex.

q. **Reporting Requirement**. If the TCH Released Parties discover conduct after the Effective Date of the Agreement that violates the statutes listed in Paragraph III.5 related to the Covered Conduct, it will report it promptly to the State of Texas and the United States. TCH's Chief Compliance Officer will certify annually for a period of six years after the Effective Date, including at the end of the six-year period, to the best

of his or her knowledge and after exercising reasonable diligence, that this requirement was met.

r. **Compliance and Ethics Program**. By October 1, 2026, TCH shall implement a compliance and ethics program designed to prevent and detect violations of the statutes listed in Paragraph III.5. TCH's Chief Compliance Officer shall be responsible for the implementation, oversight, and enforcement of the program. TCH's Chief Compliance Officer will certify annually and again by July 31, 2032 that the program has been implemented and maintained in accordance with this Agreement throughout the applicable period. At a minimum, the compliance and ethics program shall include:

    i.    Annual required training for all employees shall include an overview of applicable federal and state law governing prohibited Sex-Rejecting Procedures and Masking Conduct, including potential liability under the THFPA and Tex. Health & Safety Code § 161.701 *et seq.*;

    ii.    An automated clinical decision alert within the Texas Children's Providers' electronic health records system that activates upon the ordering of any hormone therapy medication for a patient under the age of eighteen (18). The alert shall require the prescribing provider to affirmatively attest, prior to order completion, that the medication is not being prescribed for a Sex-Rejecting purpose. No such order shall be finalized, transmitted to a pharmacy, or recorded as complete until the attestation is made. All attestations shall be logged automatically within the patient's designated record set and retained for a minimum of ten (10) years for audit and compliance review purposes;

iii. Annual required training for all employees shall include instruction on the Texas Children's Providers' internal reporting mechanisms;

iv. Annual required training for all employees shall include:

   a. a statement that the submission of claims for Sex-Rejecting Procedures is prohibited, may constitute a violation of both state and federal law, and subject a provider to Automatic Relinquishment of privileges;

   b. A statement of the civil penalties authorized under the THFPA;

   c. A statement of the THFPA's whistleblower (qui tam) provisions, including that employees who report violations may be entitled to a portion of any recovery obtained by the State of Texas;

   d. The following contact information for reporting suspected violations:

   **Office of the Attorney General of Texas**
   **Division Chief: Healthcare Program Enforcement Division**
   P.O. Box 12548
   Austin, TX 78711-2548
   (512) 463-2100

v. Upon request, TCH shall provide the Government with copies of all materials related to the compliance and ethics obligations in this Agreement.

s. **Certification Requirements**. For a period of six years from the Effective Date, TCH will take the following steps, with the Chief Compliance Officer certifying annually, to the best of his or her knowledge and belief and after exercising reasonable diligence, that TCH has:

   i. Taken reasonable, good faith efforts at all TCH Affiliated Entities to ensure that all coding for treatment of gender dysphoria, gender dysphoria-like conditions, and endocrine disorders is specific and accurate, and that general or non-specific codes are not used if more specific codes are available;

ii.  Provided annual training to all clinical staff and providers involved in coding at TCH Affiliated Entities on appropriate coding for the treatment of gender dysphoria and endocrine disorders; and

iii.  Has retained all records of TCH Affiliated Entities relevant to the certifications and will retain them for the longer of either 10 years or the applicable record retention period under federal and state law.

t.  **Detransition Clinic**. TCH shall establish the Detransition Clinic within ninety (90) days of the Effective Date. The Detransition Clinic will provide detransition-related medical care to patients up to and including the age of 21 who have received Sex-Rejecting Procedures. The Detransition Clinic shall further provide detransition-related obstetrician-gynecology medical care to patients above the age of 21 who have received Sex-Rejecting Procedures. All care provided through the Detransition Clinic shall be within the scope of the providers' credentials and TCH's applicable malpractice insurance. In furtherance of the Detransition Clinic, TCH shall ensure that services rendered through the clinic are provided at no cost to patients for a period of five (5) years. As part of its initiation and establishment of the Detransition Clinic, TCH must:

i.  Provide multidisciplinary services, but not limited to, Endocrinology, Surgery, Primary Care, Fertility Counseling, Psychiatry, Psychotherapy, Social Work/Case Management (to include navigation of insurance, legal name changes, patient navigator role to coordinate across departments), and Speech Pathology;

ii.  Create and maintain an easily accessible landing page on TCH's website describing the Detransition Clinic's services;

iii.  Require that the Medical Director of the Detransition Clinic report directly to the Chief Compliance Officer;

iv.  Include the "Detransition Clinic" as a specific gift designation on TCH's Giving webpage;

v.  Use funds donated to TCH designated for the TCH Detransition Clinic to fund free Detransition services past the initial 5-year term.

13. **Statute of Limitations**. The statute of limitations for any claims or charges relating to a breach of the Agreement shall be tolled upon the signing of this Agreement until December 31, 2032.

14. **Breach**: In the event that either the State of Texas or the United States believes there was a breach of the Agreement, the Government will give the Texas Children's Providers notice and an opportunity to explain the apparent breach before determining whether a breach occurred. If the Government reasonably determines a breach occurred or is occurring, the Texas Children's Providers shall be given a period of sixty (60) days to cure such breach to the reasonable satisfaction of the Government. If the Texas Children's Providers fail to cure such breach within such time period, the Government may, in its sole discretion, assess a liquidated damages payment of $10,000 per day starting on the day after the expiration of the cure period and ending on the day in which the breach is resolved to the reasonable satisfaction of the Government. This remedy shall be in addition to any remedy that the State of Texas or the United States has under state, federal, or common law, and does not limit the Government's ability to prosecute any violations which may occur after the Effective Date. For the avoidance of doubt, the Government retains no duty—contractual, statutory, or otherwise—to afford the Texas Children's Providers with any cure period before acting upon any violation of law.

15. **Cooperation**. The Texas Children's Providers agree to cooperate with any investigation by the State of Texas or the United States into any individual, individual whose conduct is not released, and entities not released in the Agreement. This specifically includes producing relevant communications between pharmaceutical manufacturers, sales representatives, or any other person or entity in the distribution chain related to the distribution of medical products, related to procuring puberty blockers and cross-sex hormones for the purpose of performing Sex-

Rejecting Procedures. Upon reasonable notice, TCH, TCHP, TCPG, and TCP will encourage, and agree not to impair, the cooperation of their directors, officers, and employees, and shall use their best efforts to make available, and encourage, the cooperation of former directors, officers, and employees for interviews and testimony, consistent with the rights and privileges of such individuals. TCH, TCHP, TCPG, and TCP further agree to furnish to the State of Texas or the United States, upon request, complete and unredacted copies of all non-privileged documents, reports, memoranda of interviews, and records in their possession, custody, or control concerning any investigation of the Covered Conduct that they have undertaken, or that have been performed by another on their behalf.

16.     Except as may otherwise be agreed by the Parties in connection with a particular transaction, the Texas Children's Providers agree that in the event that they undertake any change in corporate form or the sale, merger, or transfer of all, substantially all, or any material component of a TCH Affiliated Entity's business operations, they shall include in any such contract for sale, merger, transfer, or other change in corporate form of such TCH Affiliated Entity a provision binding the purchaser, or any successor in interest thereto, to the obligations applicable to the TCH Affiliated Entity as described in this Agreement. The Texas Children's Providers shall provide notice to the Government along with a written description of the proposed sale, merger, transfer, or change in corporate form of the applicable the Applicable Affiliated Entity at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in corporate form, including dissolution, in order to give the Government an opportunity to determine if such change in corporate form, sale, merger, or transfer would impact the terms or obligations of the Agreement.

17.     This Agreement is binding on the TCH Released Parties, the Office of the Texas Attorney General, Texas Health and Human Services Commission, and the United States Department of Justice but specifically does not bind any other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the United States and the State of Texas will bring the TCH Released Parties' cooperation and their compliance with their other obligations under this Agreement to the attention of such agencies and authorities upon request.

18.     This Agreement does not provide any protection against prosecution for any future conduct by the TCH Released Parties or any of their present or former parents or subsidiaries. Nothing herein shall restrict the Texas Children's Providers from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the purposes of this Agreement, as determined by the Government.

19.     This Agreement is intended to be for the benefit of the Parties only. The Parties do not release any claims against any other person or entity, except to the extent provided for in this Agreement and Paragraph 20, below.

20.     The TCH Released Parties agree that they waive and shall not seek to offset or seek any future payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third-party payors based upon the claims defined as Covered Conduct.

21.     Upon receipt of Settlement Amount, the Parties shall promptly sign and file in the Civil Action a Joint Stipulation of Dismissal of the Civil Action pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure dismissing the Civil Action with prejudice.

22.     The TCH Released Parties shall bear their own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

23.     Each Party and signatory to this Agreement represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

24.     This Agreement is governed by the laws of the United States. The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the Southern District of Texas. For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

25.     This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written agreement of the Parties.

26.     The undersigned represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

27.     This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

28.     This Agreement is binding on the TCH Released Parties' successors, transferees, and assigns.

29.     This Agreement is binding on Relator's successors, transferees, heirs, and assigns.

30.     All Parties consent to the State of Texas's and the United States's disclosure of this Agreement, and information about this Agreement, to the public.

31.     This Agreement is effective on the date of signature of the last signatory to the Agreement ("Effective Date of this Agreement"). Facsimiles and electronic transmissions of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

# THE STATE OF TEXAS

DATED: 7/27/2026   BY: _Amy S. Hilton_ (signature)
Amy S. Hilton
Chief, Healthcare Program Enforcement Division
Office of the Texas Attorney General


DATED: _____   BY: **Karen Ray** Digitally signed by Karen Ray
Date: 2026.07.27 10:45:42
-05'00'
_____
Karen Ray
Chief Counsel
Texas Health & Human Services Commission

**THE UNITED STATES**

DATED: 7/17/26     BY: _____
Brett Shumate
Assistant Attorney General
Civil Division
Department of Justice

## THE TEXAS CHILDREN'S RELEASED PARTIES

DATED: 7/21/2026     BY: _____

David L. Stockel
Deputy General Counsel
Texas Children's Hospital


DATED: 7/21/2026     BY: _____

David L. Stockel
Deputy General Counsel
Texas Children's Health Plan, Inc.


DATED: 7/21/2026     BY: _____

David L. Stockel
Deputy General Counsel
TCH Pediatrics Associates, Inc. d/b/a
Texas Children's Pediatrics


DATED: 7/21/2026     BY: _____

David L. Stockel
Deputy General Counsel
Texas Children's Physician's Group d/b/a
Texas Children's Physician Services Organization


DATED: 7/21/2026     BY: _____

Cliff Stricklin
King & Spalding
Counsel for TCH, TCP, TCPG, TCHP and TCH Affiliated
Entities

Docusign Envelope ID: D9935197-F3DB-80FB-8267-9CDF27F3C3A2

## <u>VANESSA SIVADGE</u> <u>- RELATOR</u>

DATED: 7/18/2026     BY: _____
Signed by:
Vanessa Sivadge
C4982ED2AB2D427...
Vanessa Sivadge

DATED: 7/17/2026     BY: _____
Signed by:
Marcella Burke
B8ECD7D2552141A...
Marcella Burke
Burke Law Group
Counsel for Relator

## Exhibit A

Texas Children's Hospital's providers previously performed sex-rejecting procedures, as defined in the Settlement Agreement between Texas Children's Hospital, the State of Texas, and the United States, effective as of July 27, 2026, on both minor and adult patients. Texas Children's Hospital's providers and Texas Children's Hospitals' affiliated entities have permanently and irrevocably ceased the provision, directly or indirectly, of any sex-rejecting procedures, absent a change in the law requiring TCH to provide such procedures. As provided in the Settlement Agreement, Texas Children's Hospital has removed prior media statements related to its providers' provision of sex-rejecting procedures and masking conduct, including the media statement posted by Texas Children's Hospital on May 15, 2026, related to this Agreement and the government investigation. This public statement supersedes these prior media statements on these matters.

## Exhibit B

As a material term of the Settlement Agreement, TCH shall permanently and irrevocably terminate all existing admitting privileges, clinical privileges, and staff appointments previously granted to three current physicians, Steven a/k/a Stefani Ricondo, M.D., Lauren Bretz, M.D., and Hubert Y. Ho, M.D. within 90 (ninety) days of the Effective Date. TCH further agrees that two former physicians, Dr. David Paul and Dr. Richard Ogden Roberts, shall be permanently ineligible to apply for, receive, hold, or exercise, directly or indirectly, any credentials or privileges at any current or future facility owned, operated, managed, under the control of, or affiliated with TCH. This prohibition includes but is not limited to: (a) admitting privileges of any class or category; (b) clinical privileges of any scope or specialty; (c) medical staff membership or appointment; or (d) any other form of credentialing, privileging, or authorization to practice medicine or provide any clinical services. For avoidance of doubt, the obligations set forth in this section shall be binding in perpetuity and without geographic limitations.

## Exhibit C

| Diagnosis Codes | | | | | | | |
|---|---|---|---|---|---|---|---|
| 302 | 302.3 | 302.5 | 302.51 | 302.52 | 302.53 | 302.6 | 302.8 |
| 302.85 | 302.89 | 302.9 | F64.0 | F64.1 | F64.2 | F64.8 | F64.9 |
| F66.0 | Z87.890 | E22.8 | E22.9 | E23.0 | E23.6 | E23.7 | E25.9 |
| E27.49 | E28.39 | E29.1 | E30.0 | E30.1 | E30.8 | E34.4 | E34.51 |
| E34.8 | E34.9 | J1000 | J1071 | J1380 | J1950 | J1951 | J1954 |
| J3121 | J3145 | J3315 | J3316 | J9155 | J9202 | J9217 | J9218 |
| J9219 | J9225 | J9226 | N94.6 | N94.89 | Q56.4 | S0189 | Z30.011 |
| Z51.81 | Z78.9 | Z79.890 | Z79.899 | Z86.39 | Z87.890 | Z87.898 | Z91.89 |